UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| EDMUND SPINNEY, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>GRAFTECH INTERNATIONAL LTD., CRAIG S. SHULAR, CORRADO F. DEGASPERIS, PIETER J. BARNARD, AND JOHN J. WETULA,<br><br>Defendants. | Civil Action No. _____<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff, individually and on behalf of all other persons similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by and through plaintiff's attorneys, which included, amongst other things, a review of the defendants' press releases, Securities and Exchange Commission ("SEC") filings by GrafTech International Ltd. ("GrafTech" or the "Company") and media reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.     This is a securities class action on behalf of plaintiff and all other persons or entities, except for defendants, who purchased or otherwise acquired GrafTech securities (the "Class") during the period November 3, 2005 through February 8, 2006, inclusive (the "Class

Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred by § 27 of the Exchange Act. The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5.

3.      Venue is proper in this District pursuant to § 27 of the Exchange Act. The corporate headquarters of GrafTech are located in the District.

4.      In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities exchanges.

## PARTIES

5.      Plaintiff Edmund Spinney, as set forth in the accompanying certification, incorporated by reference herein, purchased shares of GrafTech stock at artificially inflated prices during the Class Period, as described in the attached certification, and was damaged thereby.

6.      Defendant GrafTech provides synthetic, natural graphite and carbon-based products and technical, research and development services. The principal offices of the Company are located at 1521 Concord Pike, Brandywine West, Suite 301, Wilmington, Delaware 19803.

7.      Defendant Craig S. Shular ("Shular") was, at all relevant times, President, Chief Executive Officer, Acting Chief Financial Officer, and Acting Principal Accounting Officer of GrafTech.

8.     Defendant Corrado F. DeGasperis ("DeGasperis") was, at all relevant times, Vice President, Chief Financial Officer and Chief Information Officer of GrafTech.

9.     Defendant Pieter J. Barnard ("Barnard") was, at all relevant times, President, Graphite Electrode LOB and Vice President of GrafTech.

10.    Defendant John J. Wetula ("Wetula") was, at all relevant times, President, Advanced Energy Technology and Vice President of GrafTech.

11.    The individuals named as defendants in ¶¶ 7-10 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of GrafTech quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SCIENTER

12.    In addition to the above-described involvement, each Individual Defendant had knowledge of GrafTech's problems. Each defendant was motivated to conceal such problems. Defendants Shular and DeGasperis, as CEO and CFO, and Barnard and Wetula, serving as

Presidents of the Company's divisions, provided for financial reporting and communications with the market. Communications with the market, including conference calls, as well as internal reports showing GrafTech's forecasted and actual growth, were prepared under their direction. Each Individual Defendant sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market. Each individual defendant also owed a duty to the Company and its shareholders not to trade on inside information.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

13.    Each defendant is liable for (a) making false statements, *or* (b) failing to disclose adverse facts known to him about GrafTech. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of GrafTech's publicly traded securities was a success, as it: (a) deceived the investing public regarding GrafTech's prospects and business; (b) artificially inflated the prices of GrafTech's publicly traded securities; and (c) caused plaintiff and other members of the Class to purchase GrafTech's publicly traded securities at inflated prices.

14.    On November 3, 2005, the Company issued a press release titled, "GrafTech International Reports Third Quarter 2005 Results." The press release stated in part:

> Citing lower operating costs from continued productivity and cost reduction initiatives and higher than planned third quarter 2005 graphite electrode sales volume, GrafTech International Ltd. (NYSE:GTI) today reported income before special items of $12 million, or $0.11 per diluted share, for the quarter ended September 30, 2005. (See attached reconciliation of net income.)

> GTI Chief Executive Officer Craig Shular commented, "We delivered improved performance in the third quarter of 2005, including continued gross margin expansion. Gross profit for the synthetic graphite segment for the seasonally slow third quarter of 2005 was 11 percent higher than the third quarter of 2004 despite significant steel production slowdowns in most of our major markets during the first nine months of 2005, as steel producers lowered operating levels in order to reduce excess steel inventories. These lower operating levels resulted in a significant reduction of steel inventories in the U.S. and, to a lesser extent, in other regions of the world. During the third quarter, U.S. steel inventories on hand dropped to their lowest levels in 18 months. We shipped

- 4 -

approximately 48 thousand metric tons of graphite electrodes in the third quarter and we expect to ship 200 thousand metric tons of graphite electrodes in 2005."

Mr. Shular commented on the third quarter performance of GTI's electronic thermal management (ETM) product line, "We continued to gain traction in the commercialization of our advantaged technologies. During the third quarter of 2005, we received approval for the use of our ETM solutions in a second liquid crystal display (LCD) panel. This is our first approval with a leading LCD television producer. We believe the LCD flat panel television segment is expected to grow from about 5 million units in 2004 to 47 million units by 2008."

GTI's ETM sales increased nearly 70 percent, to $5 million in the third quarter of 2005 as compared to $3 million in the third quarter of 2004. *The company looks forward to a strong 2005 fourth quarter and remains on track to achieve an almost 70 percent increase in sales for the full year 2005, to $20 million as compared to $12 million in 2004.*

Third Quarter 2005 Summary

• Net sales of $209 million were comparable to third quarter 2004 net sales of $206 million, despite significant reductions in steel operating rates in 2005 as compared to 2004.

- Graphite electrode sales volume for the quarter was 47.9 thousand metric tons.

- Average graphite electrode sales revenue per metric ton was $2,835, an increase of over 13 percent as compared to the third quarter of 2004.

- ETM sales increased nearly 70 percent, to $5 million versus $3 million in the third quarter of 2004.

• Gross profit increased nine percent, to $58 million versus $54 million for the third quarter of 2004, benefiting from lower costs resulting from operating efficiencies.

• Selling, general and administrative and research and development (SG&A and R&D) expenses together totaled $26 million while interest expense was $13 million, both in line with the company's third quarter and full year guidance.

• Net income for the quarter was $16 million, or $0.15 per diluted share, including a $5 million, non-cash tax benefit, versus a $10 million net loss, including a $25 million, non-cash tax expense, or ($0.10) per diluted share, for the third quarter of 2004.

• Income before special items was $12 million, or $0.11 per diluted share, in the third quarter of 2005, as compared to $12 million, or $0.11 per diluted share, in the third quarter of 2004.

• Free cash flow before antitrust and restructuring payments was a net use of $24 million, primarily due to the $4 million of antitrust related payments in the third quarter of 2005. (See attached reconciliation of free cash flow.)

- Today, the company has only $26 million remaining to be paid to the Department of Justice -- $21 million in 2006 and $5 million in 2007 -- to bring these legacy liabilities, which have been a significant burden on the company's cash flow, to closure.

• GTI was recently informed that Citgo ceased producing green coke at its Lemont, IL facility at the end of the third quarter and has exited the premium needle coke business. GTI, as part of its procurement strategy, has not purchased significant quantities of premium needle coke from Lemont in over five years.

• GTI has secured approximately 65 percent of its 2006 graphite electrode production costs, excluding the impact of currency exchange rates. This includes 100 percent of the company's anticipated 2006 premium needle coke requirements.

Synthetic Graphite Segment

(*Graphite electrodes, cathodes and advanced graphite materials*)

GTI's six graphite electrode facilities operated at record levels in each of the first nine months of 2004 in response to high demand from a very strong steel market. Steel operating rates in each of the first nine months of 2005 were significantly lower. Despite the reduction in year-over-year steel operating rates, GTI achieved comparable net sales of $184 million for its synthetic graphite segment for the third quarter of 2005. Graphite electrode sales volume was 47.9 thousand metric tons in the third quarter of 2005 as compared to 55.8 thousand metric tons in the same period in the prior year. Average sales revenue per metric ton of graphite electrodes increased over 13 percent to $2,835 from the same period in the prior year.

Third quarter 2005 gross profit for the synthetic graphite segment increased 11 percent to $52 million, or 28.2 percent of net sales, as compared to $47 million, or 25.5 percent of net sales, in the prior year comparable period, primarily as a result of continued savings in operating costs and higher prices in the company's graphite electrode and advanced graphite materials product lines.

Mr. Shular commented, "The third quarter synthetic graphite segment gross profit and gross margin percentage were the best for the segment in the last three years, contributing to GTI's improving total company gross profit performance."

During the third quarter of 2005, GTI initiated a plan to relocate its Clarksville, TN graphite electrode machining operations to its low-cost Monterrey, Mexico production facility to achieve additional operating efficiencies. The company anticipates completing the relocation of these operations by the third quarter of 2006. This initiative will also broaden and enhance GTI's graphite electrode machining capability, thereby increasing the company's product mix flexibility and its throughput, and enhancing the company's ability to better serve its customers. Annualized cost savings associated with this initiative are projected to be $3 million.

Other Segment

(*Natural graphite (AET), carbon electrodes and refractories*)

Net sales for GTI's other segment were $25 million in the third quarter of 2005 as compared to $22 million in the third quarter of 2004. The increase in net sales was primarily due to a $2 million increase in ETM sales.

Gross profit was $6 million, or 25.8 percent of net sales, as compared to $7 million, or 29.2 percent of net sales, in the third quarter of 2004. The decline was primarily due to changes in product mix of carbon refractories.

ETM Highlights

During the third quarter of 2005, GTI's ETM solutions were approved for use in the new Samsung Sedona Ultra-light Notebook computer. Mr. Shular said, "This approval represents another win in the ultra-lightweight notebook category, and further demonstrates acceptance of eGRAF® SpreaderShield™ natural graphite as the leading heat spreader technology in this fast-growing segment of the computer market. Our materials are used in all of the high power, ultra-light notebooks in the market today that utilize this natural graphite technology."

In October 2005, GrafTech's subsidiary, Advanced Energy Technology Inc. (AET ), executed a letter of intent with iCurie, Inc. (OTC: ICUR), a full provider of thermal heat management solutions for the personal computer, consumer electronics, lighting and display industries. iCurie is a leader in next generation thermal management solutions built on their patents in thermofluid nanotechnology. The strategic partnership is expected to create new opportunities for AET in new market segments and accelerate sales growth.

Fuel Cell Highlights

Due to higher fuel costs, GTI is seeing an increase in commercialization interest for automotive fuel cell applications. GRAFCELL® expanded natural graphite is used in Ballard Power System Inc.'s Mark 900 series fuel cell platform for transportation applications, including commercial bus programs. Last week, Ballard issued an update on the success of this program. Buses powered by Ballard fuel cells have now carried over four million customers and have surpassed one million kilometers of service in European cities, including Amsterdam, Barcelona, Hamburg and London, and in Santa Clara, CA. Additional fuel cell buses are scheduled for other cities, including Beijing, China, by the end of 2005.

Mr. Shular commented, "Ballard's fuel cells, utilizing GRAFCELL®, are utilized in 85 percent of all fuel cell vehicles on the road today, including fuel cell vehicles manufactured by Ford and DaimlerChrysler. We are pleased to announce that we have recently been selected by two new large automotive manufacturers to begin work in their respective fuel cell programs in 2006. Together, these four companies represent over 50 percent of the global automotive and light truck market."

During the third quarter of 2005, GRAFCELL® expanded natural graphite was also approved for use in Ballard's Mark9 SSL™ hydrogen fuel cell for forklift applications. Mr. Shular said, "This approval puts GRAFCELL® into the

world's first commercial fuel cell forklift truck and demonstrates its continued excellent performance in expanding fuel cell applications."

Corporate

GTI will consolidate and relocate its corporate and administrative staffs to its world-class R&D facility in Parma, OH, by March 15, 2006. This initiative will result in the centralization of GTI's corporate, administrative, R&D and business teams, and is a part of the company's ongoing productivity improvement plans. In addition to various operating efficiencies the company expects to achieve as a result of the move, GTI expects to receive certain incentives, including tax incentives and business development grants, from the State of Ohio. Ohio is a strong supporter of R&D and one of the leading states supporting fuel cell technology and commercialization. Ohio has already contributed $2.4 million in cash grants in support of GTI's fuel cell commercialization initiatives.

SG&A and R&D expenses were $26 million in the third quarter of 2005 as compared to $27 million in the second quarter of 2005. The $1 million decrease is due to approximately $2 million of lower administrative costs, primarily associated with global business process improvements and net lower compensation expense, offset by approximately $1 million of higher selling costs associated with increased sales and ETM research and development efforts. The lower compensation expense includes the impact of reduced administrative resources and lower variable compensation, partially offset by the impact of higher compensation expense for amortizing the cost associated with the 1.3 million shares of restricted stock granted to GTI employees during the first nine months of 2005 as part of the company's long-term incentive programs. The company expects to recognize about $1.8 million of compensation expense in 2005 associated with these restricted shares.

SG&A and R&D expenses for the fourth quarter are expected to be $26 to $27 million, including the approximately $1 million impact of restricted stock compensation expense.

Other expense, net, was $1 million in the third quarter of 2005 as compared to other income, net, of $2 million in the third quarter of 2004. The $3 million difference was primarily due to $3 million of non-cash currency exchange losses primarily associated with Euro-denominated intercompany loans.

Interest expense was $13 million in the third quarter of 2005 as compared to $10 million in the third quarter of 2004, primarily due to higher interest rates and higher average borrowings. Interest expense in the fourth quarter of 2005 is expected to be approximately $14 million.

The effective tax rate before special charges and other expense, net, for the nine months ended September 30, 2005 was approximately 39 percent, slightly higher than planned due to a higher proportion of income in higher tax jurisdictions. During the 2005 third quarter, the effective tax rate before special charges and other expense, net, was 41 percent due to $1 million of higher tax expense associated with the cumulative impact of a higher effective tax rate for the year. As announced in the 2004 third quarter, the company elected and implemented a tax planning strategy that, together with other planning efforts, accelerated the use of certain tax assets. As a result of the finalization of the 2004 tax return and related estimates, GTI recorded in the third quarter of 2005 an

additional $5 million of non-cash tax benefit associated with the impact of this tax strategy. This tax strategy is expected to result in lower future cash taxes.

Free cash flow before antitrust and restructuring payments was a net use of $24 million, primarily due to the use of cash for scheduled interest payments of $23 million and a use of cash of $21 million for working capital, primarily for inventory and related payables. The company paid $1 million of restructuring and $4 million of antitrust related payments in the third quarter of 2005.

Outlook

Mr. Shular commented on GTI's outlook, "Based on positive feedback from our customers on their fourth quarter order books and lower steel inventory levels, we expect higher steel operating rates in the fourth quarter of 2005 as compared to the first three quarters of the year. In addition, our customers have indicated their intention to take full delivery of their committed 2005 requirements in this environment of rising graphite electrode prices. Accordingly, graphite electrode sales volume for the fourth quarter of 2005 is projected to be 57 thousand metric tons, resulting in full year 2005 graphite electrode sales volume of 200 thousand metric tons. At current currency exchange rates, we expect 2005 average graphite electrode revenue per metric ton to be approximately $2,850. On the cost side, we expect 2005 graphite electrode production costs to be 10 percent higher year-over-year, at the low end of our guidance of 10 to 12 percent."

***GTI expects full year 2005 earnings per share in the range of $0.43 to $0.45 before special items. The company also expects free cash flow before antitrust and restructuring payments for 2005 to be a use of $10 million.***

Commenting on 2006 outlook, Mr. Shular said, "Although we are still early in the process, the building of the 2006 order book is proceeding well. The global graphite electrode pricing environment continues to improve as global demand for high quality, reliable graphite electrodes grows. In response to these market conditions and continued cost pressures, effective November 1, 2005, we increased our price for standard size melter graphite electrodes by $150 per metric ton to $4,250 per metric ton in the Americas, CIS, the Middle East, Africa, and Asia. In Europe, we increased our price for standard size melter graphite electrodes to €3,200 per metric ton. Prices in the non-melter graphite electrode segment, which represents about 30 percent of our graphite electrode demand, continue to vary significantly due to the variety of end markets and performance requirements across those end markets and higher availability of lower grade products."

As GTI looks forward to 2006, reducing the variability of, and risks to, its cost structure remains a priority for the company. Mr. Shular commented, "Our team remains focused on continuing to execute on the various productivity enhancements we have already identified to contain 2006 graphite electrode production cost increases to a range of 10 percent to 12 percent, while laying a strong foundation for future growth and profitability."

Mr. Shular concluded, "We look forward to the 2006 year. Global steel inventories have fallen, 2006 steel outlook is positive, and our plant operations are running superbly, enabling our best and most consistent product quality ever. In addition, we continue to exploit the mega trend toward smaller, lighter and more demanding electronic devices as our ETM products and solutions continue

outperforming competing materials in fast-growing segments such as laptop computers and flat screen plasma and LCD televisions. We expect continued strong ETM sales in 2006, and we are projecting 2006 sales of at least $30 million." [Emphasis added]

15.    On December 15, 2005, defendants issued a press release entitled, "Graftech

Announces Change In Principal Officers." The press release stated in part:

> GrafTech International Ltd. (NYSE:GTI) today announced that on December 12, 2005, Corrado F. DeGasperis resigned as Vice President, Chief Financial Officer and Chief Information Officer of GrafTech International Ltd. to pursue other opportunities. Mr. DeGasperis will remain an employee of GrafTech in support of a transition through the year-end financial accounting and reporting processes.    GrafTech is commencing a search for a replacement for Mr. DeGasperis. In the interim, Craig Shular, GrafTech's Chief Executive Officer, has been appointed by the Board of Directors of GrafTech as the acting Chief Financial Officer and Principal Accounting Officer. Mr. Shular, who has been a Certified Public Accountant, joined GrafTech in January 1999 and was its Chief Financial Officer until May 2001.
>
> Mr. Shular commented, "During his seven and a half years with the company, Corrado has been an important part of our GrafTech management team that has restructured our operations, settled our legacy antitrust obligations, stabilized our capital structure and helped to position the company for future growth and profitability.  Our whole organization wishes him well in his future endeavors."

                                         * * *

16.    On February 8, 2006, after the close of the markets, defendants issued a press

release entitled, "GRAFTECH PROVIDES MARKET UPDATE AND PRELIMINARY 2006

OUTLOOK." The press release stated in part:

GrafTech International Ltd. (NYSE:GTI) today announced:

   • Preliminary 2005 results

           - Graphite electrode sales volume of 201.3 thousand metric tons

           - Average graphite electrode revenue per metric ton of $2,846

           - Graphite electrode production cost increase contained to a level below the company's 10 to 12 percent guidance

   • Graphite electrode 2006 sales order book status and current market conditions

   • Continued productivity and cost savings initiatives

• Preliminary 2006 outlook

2005 Preliminary Results

Dollars in millions, except average revenue per metric ton data

|  | 2005 Guidance | 2005E |
|---|---|---|
| Total net sales increase vs. 2004 | +5% | +5% |
| ETM net sales guidance | $20 | $19 |
| GE average revenue per metric ton | $2,850 | $2,846 |
| GE sales volume in metric tons | 200,000 | 201,300 |
| GE cost increase vs. 2004 | +10%-12% | Less than 9% |
| Non-GE business gross profit growth vs. 2004 | -$4 | -$6 |

Graphite Electrode 2006 Sales Order Book Status and Current Market Conditions

Consistent with prior years, the company has to date completed about 75 percent of its annual graphite electrode sales order book. Commenting on the 2006 graphite electrode sales environment, GTI Chief Executive Officer Craig Shular said, "Global graphite electrode prices continue to improve across all geographies, with the most significant price increases being achieved in the Asia Pacific region. The North America book has also come together nicely in this dynamic book building process. We have been very disappointed with realized price increases in the European market. In fact, European prices are now lower than Asian prices for the first time in over 10 years.

"Overall, we anticipate net sales of graphite electrodes to increase about 15 percent in 2006 as compared to 2005. This increase includes graphite electrode sales volume growth of five to seven percent over 2005 sales volume of 201.3 thousand metric tons. Graphite electrode sales mix is expected to be about 70 percent melter and 30 percent non-melter."

Mr. Shular continued, "In 2005, we were able to contain graphite electrode production cost increases to less than nine percent, better than expected, through our continued pursuit of productivity and cost savings initiatives. To date, our team has secured firm raw material pricing for over 70 percent of our 2006 graphite electrode production costs. Accordingly, we expect to contain 2006 cost increases to a range of 10 to 12 percent."

Productivity and Cost Savings Initiatives

As part of its ongoing productivity and cost savings program, GTI intends to complete certain operational initiatives announced in 2005, and undertake additional initiatives in 2006, to continue improving its operating performance, including non-graphite electrode production and corporate administrative cost reductions. The planned actions include consolidating operations, streamlining

certain production capabilities and leveraging the overall infrastructure for greater productivity.

The 2006 productivity and cost savings program includes the following actions:

SYNTHETIC GRAPHITE SEGMENT

(Graphite electrodes, cathodes and advanced graphite materials)

□ Optimizing the company's graphite electrode production network. Building on the company's recent success in getting more out of its large graphite electrode plants through productivity enhancements, faster cycle times and de-bottlenecking activities, the company is now positioned to shut down its least advantaged facility - Vyazma, Russia – in the 2006 fourth quarter. The Russian facility, with annual production capacity of approximately 17 thousand metric tons, is the smallest and the only non-integrated facility in GTI's production network. GTI expects to maintain annual graphite electrode production capacity of about 230 thousand metric tons by relocating approximately 10 thousand metric tons of cathode production capacity from Salvador, Brazil to Notre Dame, France, thereby increasing the graphite electrode capacity of the Brazilian facility. The remaining 7 thousand metric tons of capacity will be made up over the next 18 to 24 months through continuous productivity improvements. The company expects this action to increase its average graphite electrode plant size by 20 percent, allowing the company to enjoy further economies of scale, thereby, reducing overall graphite electrode production costs.

In addition, as previously announced, GTI will relocate graphite electrode machining operations from Clarksville, TN to its low-cost Monterrey, Mexico production facility, which is the largest graphite electrode production facility in the world. The company will also permanently shut down its remaining graphite electrode machining operations in Caserta, Italy. Current plans call for machining operations in Clarksville and Caserta to be curtailed by September 2006 and June 2006, respectively. Mr. Shular commented, "These actions support the company's well-defined strategy of leveraging our global manufacturing network. Our uniquely positioned global production network provides us with significant competitive advantages in costs and product quality, proximity to customers, timely and reliable delivery and flexibility to adjust product mix to serve the needs of our global steel customers."

□ Increasing profitability in non-graphite electrode product lines. GTI plans to complete a comprehensive restructuring of its cathode product line to increase profitability. The plan, which began in 2005, will focus GTI's Notre Dame, France facility, which currently produces multiple synthetic graphite product lines, on cathode production. As a result of focusing production on a single product line, GTI expects to achieve operating efficiencies and production cost savings.

CORPORATE

□ Corporate and administrative cost savings. As previously announced, GTI will substantially complete a consolidation of its corporate and administrative

services by March 31, 2006. These activities will result in the centralization of corporate services currently provided by GTI's Clarksville, TN, and Wilmington, DE offices in its company owned Parma, OH facility, which currently houses its global R&D and business teams. The company will also centralize certain corporate services performed in Etoy, Switzerland in Parma, OH. Centralizing the company's global business and financial leadership teams in Parma is expected to increase efficiencies and provide administrative cost savings.

These actions are expected to result in annualized recurring cost savings of $20 million to $22 million. Approximately 25 percent of the savings are expected to be realized in 2006, with the full benefit of the savings realized in 2007 and beyond. The portion of cost savings related to the graphite electrode line of business has already been included in the company's guidance of 2006 graphite electrode production cost increases in the range of 10 to 12 percent.

The company expects to record expenses of approximately $10 million related to this program in the 2005 fourth quarter. GTI expects to record an additional $7 million in 2006 and $2 million in 2007.

Cash expenditures related to this program of $17 million are expected in 2006, with the remaining $2 million in 2007. The company anticipates funding the majority of these costs with the sale of real estate. Mr. Shular said, "Our team continues to take aggressive actions to improve our cost competitiveness and increase our cash flow from operations. We will continue to relentlessly execute on productivity improvements and maintain our low cost position in this industry."

<u>2006 Preliminary Outlook</u>

Dollars in millions

| | |
|---|---|
| ETM net sales | $30 |
| Net sales of GE vs. 2005 | +15% |
| GE sales volume in metric tons | +5% to 7% |
| GE cost increase vs. 2005 | +10% to 12% |
| Non-GE business gross profit growth vs. 2005 | +$6 to $8 |

\*\*\*

17.    On the news of February 8, 2006, the price of GrafTech shares plunged 37.0%, on unusually high volume, falling from $7.31 per share on February 8, 2006 to $4.60 per share on February 9, 2006, for a one-day drop of $2.71 per share, on volume of 9.8 million shares, nearly twelve times the average daily trading volume.

18.     During the Class Period, defendants knew and concealed that:

(a)     pricing power for the Company's graphite electrode products was nonexistent, particularly in the European markets;

(b)     announced cost-cutting measures were insufficient to achieve  required improvements to the Company's bottom line;

(c)     contraction of the market for the Company's non-graphite product lines was an adverse component contributing to the Company's financial woes;

(d)     serious unaddressed issues existed with the Company's ability to accurately forecast growth and report guidance, consistent with potential deficiencies in the Company's internal controls and corporate compliance; and

(e)     the Company's inability to determine the required extent of its restructuring activities and charges necessary to counter the costs of its staggering debt and loss of pricing power grossly understated the true costs defendants would incur to restructure the Company.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased GrafTech publicly traded securities on the open market during the Class Period.  Excluded from the Class are defendants.

20.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  GrafTech had more than 97 million shares of stock outstanding, owned by hundreds if not thousands of persons.

21.     There is a well-defined community of interest in the questions of law and fact involved in this case.   Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     Whether the Exchange Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     Whether the prices of GrafTech's publicly traded securities were artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

22.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

23.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.   Plaintiff has no interests that conflict with those of the Class.

24.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of § 10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

25.    Plaintiff incorporates ¶¶ 1-24 by reference.

26.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

27.    Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of GrafTech publicly traded securities during the Class Period.

28.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for GrafTech publicly traded securities. Plaintiff and the Class would not have purchased GrafTech publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

29.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of GrafTech publicly traded securities during the Class Period.

## COUNT II

### For Violation of § 20(a) of the Exchange Act
### Against All Defendants

30.     Plaintiff incorporates ¶¶ 1-29 by reference.

31.     The Individual Defendants acted as controlling persons of GrafTech within the meaning of § 20(a) of the Exchange Act.  By reason of their positions as officers and/or directors of GrafTech, and their ownership of GrafTech stock, the Individual Defendants had the power and authority to cause GrafTech to engage in the wrongful conduct complained of herein. GrafTech controlled each of the Individual Defendants and all of its employees.  By reason of such conduct, the Individual Defendants and GrafTech are liable pursuant to § 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to FRCP 23;

B.     Awarding plaintiff and the members of the Class damages, interest and costs; and

C.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated:  February 28, 2006

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**

/s/  Brian D. Long
Seth D. Rigrodsky (DSBA No. 3147)
Brian D. Long (DSBA No. 4347)
919 North Market Street, Suite 980
Wilmington, DE  19801
Tel:  302-984-0597
Fax:  302 984-0870

- and -

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**
Steven G. Schulman
Peter E. Seidman
One Pennsylvania Plaza
New York, NY  10119
Tel:  212-594-5300
Fax:  212-868-1229

**SCOTT + SCOTT, LLC**
David R. Scott
P.O. Box 192
Norwich Avenue
Colchester, CT 06078
Tel:  860-537-5537
Fax:  860-537-4432

**Attorneys for Plaintiff**

**JS 44** (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

EDMUND SPINNEY, on Behalf of Himself and All Others Similarly Situated

**(b)** County of Residence of First Listed Plaintiff   Calvert County, MD
(EXCEPT IN U.S. PLAINTIFF CASES)

## DEFENDANTS

GRAFTECH INTERNATIONAL LTD., CRAIG S. SHULAR, CORRADO F. DEGASPERIS, PIETER J. BARNARD, AND JOHN J. WETULA

County of Residence of First Listed Defendant   New Castle County, DE
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Seth D. Rigrodsky (DSBA #3147)   Milberg Weiss Bershad & Schulman LLP
Brian D. Long (DSBA #4347)   919 North Market St., Suite 980, Wilmington, DE 19801
Tel: (302) 984-0597

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | **PERSONAL INJURY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 362 Personal Injury - Med. Malpractice | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 368 Asbestos Personal Injury Product Liability | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 340 Marine | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge |
| ☐ 195 Contract Product Liability | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 864 SSID Title XVI | 12 USC 3410 |
| ☐ 196 Franchise | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | **CIVIL RIGHTS** | ☐ 720 Labor/Mgmt. Relations | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 441 Voting | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 442 Employment | **PRISONER PETITIONS** | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 443 Housing/ Accommodations | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 444 Welfare | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | ☐ 950 Constitutionality of State Statutes |
| | ☐ 445 Amer. w/Disabilities - Employment | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | |
| | ☐ 446 Amer. w/Disabilities - Other | ☐ 535 Death Penalty | | |
| | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | |
| | | ☐ 550 Civil Rights | | |
| | | ☐ 555 Prison Condition | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder

Brief description of cause:

Violations of Federal Securities Laws

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ To be determined

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE   February 28, 2006

SIGNATURE OF ATTORNEY OF RECORD   /s/ Brian D. Long (DSBA # 4347)

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____ ⁞ �
⌣
3

# **ACKNOWLEDGMENT**
# **OF  RECEIPT  FOR AO FORM  85**

# *NOTICE OF AVAILABILITY OF A*
# *UNITED STATES MAGISTRATE JUDGE*
# *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____5_____ COPIES OF AO FORM 85.

FEB 2 8 2006
_____
(Date forms issued)

_Ben Lougheed_
(Signature of Party or their Representative)

_Ben Lougheed_
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action

*EC/TS*

## PLAINTIFF CERTIFICATION
## PURSUANT TO FEDERAL SECURITIES LAWS

EDMUND SPINEY, ("Plaintiff"), declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the Complaint and retains Scott & Scott, LLC and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel, or in order to participate in any private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transaction(s) in the **Graftech International LTD.** ("GTI") security that is the subject of this action during the Class Period is/are as follows:

| No of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 300 | B | 04/13/04 | $14.33 |
| 300 | S | 05/17/04 | $7.94 |
| 300 | B | 07/07/04 | $10.17 |
| 300 | S | 10/15/04 | $10.63 |

5.    During the three years prior to the date of this Certification, Plaintiff has never served, nor sought to serve, as a class representative in a federal securities fraud case.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _12_ day of ___Feb___, 2006, at _Lusby, MD_____ (city, state).

Your Printed Name:    ____Edmund Spiney____

Signature:    _____

Mailing Address:    ___831 Cove Point Road_____

____Lusby, MD  20657_____

_____

Telephone number:    ____(401) 426-4020_____

E-mail address :    _____